IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| JOEL H. FINLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil No. 2014-52 |
| ) | |
| GARY D. MOLE, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

### MEMORANDUM OPINION AND ORDER

Before the Court is defendant's motion to dismiss,[1] which the Court construes as a motion to enforce the parties' purported settlement agreement.[2] [DE 21]. Plaintiff disputes that a settlement occurred, claiming it is vitiated by fraud in the inducement. On March 16, 2005, the Court held an evidentiary hearing and also entertained oral argument on the motion. Thereafter, in accordance with the Court's directive, the parties submitted briefs on their respective positions as to whether, under controlling law, the Court may consider extrinsic evidence in support of a contention of fraud in the inducement when presented with a written settlement agreement containing an integration clause.

### I.    FACTUAL BACKGROUND[3]

1. Defendant Gary Mole, a citizen of Massachusetts, was the chief executive officer of Glacial Energy (VI), LLC ("Glacial").

2. Plaintiff Joel Finley, a citizen of the United States Virgin Islands, was previously employed with Glacial as president of sales.

---

[1]      Defendant does not specify the rule under which the motion is brought.

[2]      The instant motion was filed by Michael C. Quinn, Esq., defendant's prior counsel. On August 7, 2014, Attorney Quinn moved to withdraw as attorney of record. On August 15, 2014, David J. Cattie, Esq., filed a Notice of Appearance on defendant's behalf.

[3]      This factual background is derived primarily from the testimony of plaintiff and plaintiff's counsel, Ryan C. Meade, Esq., during the evidentiary hearing.

3. In 2013, Finley was president of sales. That year, Glacial posted average revenue of "about $500,000 per month."

4. During 2013, Finley managed approximately fifty Glacial employees.

5. Finley was in business with Mole for many years.

6. On May 6, 2014, Finley filed the instant action against Mole for failure to pay a prior debt.

7. On an unspecified date thereafter, a third party – known to Finley as A.J. Talley – advised Finley of Mole's interest in settling the instant action.

8. Talley advised that he wished to personally settle Mole's outstanding debt in exchange for Finley's dismissal of the instant action.

9. Finley notified Attorney Meade of Talley's interest in settling Mole's debt. Michael C. Quinn, Esq. – Mole's then-attorney – had earlier advised Attorney Meade that the parties had decided to settle.

10. Attorney Meade called Talley. He communicated with Talley "half a dozen to ten" times.

11. At all relevant times, Finley and Attorney Meade both viewed Talley as Mole's agent.

12. All of Finley's communications regarding the settlement of Mole's outstanding debt were with either Talley or his own counsel. Finley did not have settlement discussions with Mole.

13. Talley indicated he wanted confidentiality with respect to Finley's dismissal of Finley's action against Mole.

14. The terms of the parties' purported settlement are in a document titled "Settlement Agreement and Mutual Release" (the "Finley-Mole Agreement").

15. Attorney Quinn had emailed an unsigned copy of the Finley-Mole Agreement to Attorney Meade. Attorney Meade sent a copy of the Finley-Mole Agreement to Finley.

16. The Finley-Mole Agreement is four pages, double-spaced, and contains the following clause (paragraph 6):

> 6. This Agreement contains the entire agreement and understanding between and among the Parties regarding the matters set forth herein and supersedes all previous negotiations, discussions and understandings regarding such matters. The Parties acknowledge and represent that they have not relied on any promise, inducement, representation, or other statement made in connection with this Agreement that is not expressly contained herein. The terms of this Agreement are contractual and not a mere recital.

17. The Finley-Mole Agreement also provides (in paragraph 1) that "[t]he Parties agree to the dismissal with prejudice of the [instant action]."

18. The Finley-Mole Agreement further provides (in paragraph 2) that the parties release and discharge one another from the claims that were or could have been advanced in the instant case, as well as any claims related to the "M/V Nonsense."[4]

19. The Finley-Mole Agreement also provides (in paragraph 10) that it "may be executed in counterparts and shall constitute an agreement binding on all the Parties notwithstanding that all the Parties are not signatories to the original or same counterpart."

20. Finley received the Finely-Mole Agreement from Attorney Meade, printed it out, read it and signed it. He then scanned the signed document and returned it to Attorney Meade by email.

21. Attorney Meade drafted a separate agreement between Talley and Finley titled "Settlement and Satisfaction of Debt Agreement" (the "Finley-Talley Agreement").[5]

22. According to Finley, he had a "different deal going on" with Talley than what is reflected in the Finley-Mole Agreement. With respect to the Finley-Mole Agreement and the Finley-Talley Agreement, Finley testified "one agreement didn't have to do with the other one."

23. Finley testified that the Finely-Mole Agreement contained no language making it contingent on anything that was not included in the Agreement.[6]

24. Finley executed the Finley-Mole Agreement on July 30, 2014.

25. On July 30, 2014, Attorney Meade forwarded an unsigned copy of the Finley-Talley Agreement to Talley. Talley signed and returned the document to Attorney Meade that same day.

26. On July 30, 2014, Attorney Meade forwarded the Finley-Mole Agreement – signed only by Finley – to Talley.[7]

---

[4]  Finley testified that the M/V Nonsense was a boat that he and Mole used to co-own, which had been involved in an accident.

[5]  During the evidentiary hearing, Attorney Meade testified that Attorney Quinn was not involved in any way with the agreement between Talley and Finley.

[6]  According to Finley and Attorney Meade, however, the Finley-Mole Agreement was contingent on Talley wiring the $1,200,000.00 to Finley's bank account. The wiring of the funds in turn was contingent on Finley signing the Finley-Mole Agreement and providing Talley a copy thereof.

[7]  Attorney Meade testified that he provided this agreement to Talley with "the specific instruction that it wouldn't go to anybody else until we got the funds." The fax cover sheet included with the executed Finley-Mole Agreement, however, contained no instructions.

27. On August 7, 2014, Mole filed the instant motion. Attached as an exhibit to the motion is the Finley-Mole Agreement, on which the signatures of both Finley and Mole appear. Mole's signature is dated July 30, 2014.

28. Finley authenticated Mole's signature on the Finley-Mole Agreement.

29. To date, Finley has not received any funds from Talley.

## II. LEGAL STANDARD

If a settlement agreement is valid, it is enforceable like any other binding contract. *See Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3d Cir. 1970) ("An agreement to settle a law suit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court . . . ."). "The law is well settled that a district court has jurisdiction to enforce a settlement agreement entered into by litigants in a case pending before it." *Pugh v. Super Fresh Food Markets, Inc.*, 640 F. Supp. 1306, 1307 (E.D. Pa. 1986); *accord Fox v. Conrail*, 739 F.2d 929, 932 (3d Cir. 1984). "Such jurisdiction is founded on the policy that favors the amicable adjustment of disputes and the avoidance of costly and time-consuming litigation." *Pugh*, 640 F. Supp. at 1307; *accord Castolenia v. Crafa*, 2014 V.I. LEXIS 1, at *5-6 (V.I. Super. Ct. Jan. 15, 2014) ("Settlement agreements are encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by courts."); *see FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2234 (2013) ("[A] general legal policy favor[s] the settlement of disputes.").

"Voluntary settlements are broadly interpreted." *James v. Fitzpatrick*, 25 V.I. 124, 126, 1990 V.I. LEXIS 22, *4 (V.I. Terr. Ct. 1990) (citing *Pennwalt Corp. v. Plough*, 676 F.2d 77 (3d Cir. 1982)). "In order to prevail on a motion to enforce settlement, the moving party must satisfy the court that there are no disputed issues of material fact as to the validity of the settlement agreement." *Thomas v. Lockheed Martin Aeroparts, Inc.*, 2015 U.S. Dist. LEXIS 35134, at *7

(W.D. Pa. Mar. 20, 2015) (citing *Tiernan v. Devoe*, 923 F.2d 1024, 1032 (3d Cir. 1991) and FED. R. CIV. P. 56(c)).[8]

### III.   DISCUSSION

The Court's consideration of the instant motion requires determining (1) what law to apply to evaluate the validity of the agreement, (2) whether an enforceable agreement exists and (3) if so, whether the Court can consider extrinsic evidence of fraud in deciding whether to enforce the agreement.

**A.   Choice of Law**

Because the Court obtained jurisdiction through diversity of citizenship, it is bound to apply the substantive law of the Virgin Islands. *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). This principle applies to the Virgin Islands law regarding choice-of-laws. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). In determining the applicable law in contract matters, "the contacts to be taken into account" are as follows: "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188; *accord*

---

[8]   Plaintiff filed a motion for summary judgment on June 27, 2014. [DE 12]. At an initial pretrial conference on July 10, 2014, the parties agreed that Mole would be entitled to conduct discovery before having to respond to the summary judgment motion. [DE 16]. The purported settlement occurred shortly thereafter. In response to the instant motion, Finley twice moved for an extension of time to respond, claiming he now had to take additional discovery on the circumstances surrounding the entry into the Finley-Mole Agreement, and whether there had been fraud [DEs 30, 32], but he made no effort thereafter to obtain any such discovery. When Finley finally responded to the instant motion on September 15, 2014, he again claimed he needed to take discovery, this time under Fed. R. Civ. P. 56(d). But, in the six months between the filing of the response and the March 16, 2015 hearing, Finley again made no effort whatsoever to secure any such discovery. When the Court inquired of plaintiff at the hearing why no discovery had been pursued, counsel was equivocal at best as to whether any additional discovery actually was required. Under these circumstances, given the passage of time and plaintiff having had ample opportunity to pursue discovery of which he did not avail himself, the Court deems plaintiff's request for discovery to have been waived. Further, for the reasons explained more fully below, even if plaintiff had obtained discovery tending to support the allegations of underlying fraud, such evidence would be deemed inadmissible.

*Metro. Life Ins. Co. v. Dysart*, 2008 U.S. Dist. LEXIS 97915, at *16017 (D.V.I. 2008); *B A Props., Inc. v. Aetna Cas. & Sur. Co.*, 273 F. Supp. 2d 673, 678 (D.V.I. 2003).

While Mole allegedly resides in Massachusetts, the Virgin Islands has a more significant relationship to the transaction and the parties in light of the above considerations.  Thus, the Court turns to Virgin Islands law to resolve this matter.   The local law generally applicable to contracts in the Virgin Islands is the Restatement (Second) of Contracts.  *See Castolenia*, 2014 V.I. LEXIS 1, at *7 n.28 (discussing whether parties entered into a valid settlement agreement and citing Restatement (Second) of Contracts); *see also MRL Development I, LLC v. Whitecap Investment Corp.*, 2014 U.S. Dist. LEXIS 24081 (D.V.I. Feb. 26, 2014) (applying Restatement (Second) of Contracts in considering breach of contract action).  The parties, by their briefing, acknowledge that Virgin Islands law should be applied.

**B.	The parties entered into a valid settlement agreement.**

"Under Virgin Islands law, the essential prerequisites for the creation of a valid contract are a bargain in which there is a manifestation of mutual assent[9] to the exchange and a consideration."  *Virgin Islands Water & Power Auth. v. General Elec. Int'l*, 51 V.I. 1116, 1121 (D.V.I. 2009) (citing Restatement (Second) of Contracts § 17) (footnote added); *accord Castolenia*, 2014 V.I. LEXIS 1, at *7.

When considering the enforceability of a contract, the court first ascertains the intent of the parties as objectively manifested by them.  *See HSM Constr. Servs. v. MDC Sys.*, 239 Fed. Appx. 748, 751 (3d Cir. 2007) ("The parties' objective manifestations control in deciding whether they formed a contract by mutual assent.").  In so doing, the court "must make a preliminary inquiry as to whether the contract is ambiguous."  *Sunshine Shopping Ctr., Inc. v.*

---

9	*See Govia v. Burnett*, 45 V.I. 235, 242 (V.I. Terr. Ct. 2003) ("Mutual assent simply implies that the parties agreed to the contract."); *Morales v. Sun Constructors, Inc*., 541 F.3d 218, 221 (3d Cir. 2008) (noting "mutual assent is 'sometimes referred to as a meeting of the minds") (quoting Restatement (Second) of Contracts § 17 cmt. c).

*Kmart Corp.*, 85 F. Supp. 2d 537, 540 (D.V.I. 2000).  A contract may be found ambiguous if it is susceptible to two or more interpretations. *Id.*; *accord Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980).  The "plain meaning rule" applies in ascertaining the intent of the parties to a contract, which assumes their intent is expressed in the writing itself.  *Sunshine Shopping Ctr., Inc.*, 85 F. Supp. 2d at 540.   When the words used are clear and unambiguous, intent is ascertained from the express language of the contract.  *Id*.  If a contract provision is unambiguous – i.e., can reasonably be read only one way – "the court will interpret it as a matter of law."  *Id*.

Finley – a seasoned businessman – testified that he read the Finley-Mole Agreement.  *See Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 222 (3d Cir. 2008) ("[E]very contracting party has the duty 'to learn and know the contents of a contract before he signs and delivers it.'") (quoting *Hoshaw v. Cosgriff*, 247 F. 22, 26 (8th Cir. 1917)); *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained."). His testimony included acknowledgement of paragraph 6 – a significant provision in terms of the present dispute. That clause is a plain and unambiguous manifestation of the parties' intent.  It sets out in concise language the parties' understanding that the agreement is a complete and exclusive statement of the contract terms.   It also expressly disavows reliance on any representation or promise not set forth in the document.

Next, the Court considers whether the Finley-Mole Agreement was supported by consideration.   "'Consideration' requires a performance or a return promise that has been bargained for."  *Nicholas v. Wyndham Int'l, Inc.*, 2007 U.S. Dist. LEXIS 9182, at \*5 (D.V.I. Nov. 20, 2007) (citing Restatement (Second) of Contracts § 17).  Here, the agreement is supported by

*Finley v. Mole*
Civil No. 2014-52
Page 8

the following consideration: (1) Finley agreed to dismiss the instant action; (2) Mole agreed to waive any claims that he could have brought in this action against Finley; and (3) Finley and Mole each agreed to waive any claims against the other that could have been brought pertaining a 2010 Regulator motor vessel named "Nonsense."  Finley-Mole Agreement ¶¶ 1-2.

In sum, the Court finds that (1) the parties objectively manifested an intention to be bound by the terms of Finley-Mole Agreement and (2) the Finley-Mole Agreement "was supported by consideration on both sides."  *Castolenia*, 2014 V.I. LEXIS 1, at *12; *accord Merchants Commercial Bank*, 2013 WL 3337286, at *2.  Accordingly, the Court finds the Finley-Mole Agreement meets the requirements for a valid contract.

C.     **The Court cannot consider extrinsic evidence of fraud.**

Having found that the Finley-Mole Agreement is a properly formed contract, the Court next considers Finley's claim that the settlement agreement is voidable because of fraud.  Finley contends that while his underlying claim in this lawsuit falls within the parameters of the Finley-Mole Agreement and thus appears to have been resolved, he also contends that Mole, via Talley, induced Finley to sign the agreement by fraud.  Finley claims that evidence will show that Talley misrepresented to him that he [Talley] would wire $1,200,000.00 to Finley's bank account in exchange for Finley's dismissal of the instant action against Mole.  Therefore, Finley argues, his obligation to dismiss this case did not mature until the money was received.  Mole, on the other hand, argues that the Finley-Mole Agreement is in an integrated agreement containing no such contingency and expressly disclaims reliance on representations or promises not contained in the writing; thus, the Court cannot consider extrinsic evidence.

Generally, the existence of an integration clause precludes the introduction of parol evidence.  *See Blackledge v. Allison*, 431 U.S. 63, 75 n.6 (1977) ("The parol evidence rule has as

its very purpose the exclusion of evidence designed to repudiate provisions in a written integration of contractual terms."); *Phillips v. Andrews*, 332 F. Supp. 2d 797, 803 (D.V.I. 2004) (stating "a writing intended as the entire understanding of the parties is then subject to the parol evidence rule which precludes consideration of extrinsic evidence of prior or contemporaneous agreements extending or altering the authority granted in a writing"). Nevertheless, as the United States Supreme Court noted in dicta,

> Yet even a written contractual provision declaring that the contract contains the complete agreement of the parties, and that no antecedent or extrinsic representations exist, does not conclusively bar subsequent proof that such additional agreements exist and should be given force. The provision denying the existence of such agreements, of course, carries great weight, but it can be set aside by a court on the grounds of fraud, mistake, duress, or on some ground that is sufficient for setting aside other contracts.

*Blackledge*, 431 U.S. at 75 n.6 (internal quotation marks omitted; citations omitted).

The Court has not found any Virgin Islands Supreme Court case addressing this question, and the parties have not identified any either. Two lower court decisions, however, indicate the Virgin Islands would likely follow the general rule that an integration clause will not preclude the introduction of extrinsic evidence to establish fraud in the inducement. *See Ball v. Toth*, 18 V.I. 185 (V.I. Terr. Ct. 1982) (noting that the parol evidence rule applies generally to an integrated agreement but does not operate to bar evidence of "fraud in the inception"); *Jefferson v. Bay Isles Assocs., L.L.L.P.*, 59 V.I. 31, 46 (V.I. Super. Ct. 2011) (stating "extrinsic evidence may be . . . used to establish . . . fraud" despite the parties' intent that a document "be the complete and final statement of their agreement"); *see also Walid v. Yolanda for Irene Couture*, 40 A.3d 85, 94 (N.J. Super. Ct. 2012) (stating "the introduction of extrinsic evidence to prove fraud in the inducement is a well-recognized exception to the parol evidence rule"); *Youndt v. First Nat'l Bank*, 868 A.2d 539, 546 (Pa. Super. Ct. 2005) (stating where fraud in the inducement

is alleged, parol evidence is admissible to prove the fraud under certain circumstances); *ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006) (stating "Delaware courts have shared [a] distaste for immunizing fraud" in misrepresentation cases involving merger clauses and citing cases)

While this well-recognized exception to the general rule appears subject to only one interpretation – that is, evidence concerning fraud is always admissible – a closer inspection of case law indicates that is not the case. Rather, the applicability of this exception requires a fact-specific analysis. For example, in *Jefferson*, where it appears the parties worked together, at least in part, regarding the subject agreement, the court found the fraud exception did not apply to that integrated agreement because: (1) the statement that the agreement was the "entire" agreement between the parties voided any other prior promises; (2) a lack of facts suggesting an alleged representation "was supposed to be incorporated into the parties' final integrated agreement;" and (3) the existence of "several disclaimers," including disclaiming representations made by defendants not included in the agreement. *Jefferson*, 59 V.I. at 47.

Similarly, in *ABRY Partners*, the court, despite Delaware's adoption of the fraud exception, held that plaintiff, a sophisticated party, could not reasonably rely upon representations outside of the negotiated agreement, where the agreement contained a provision explicitly disclaiming reliance upon such outside representations. In so holding, the court explained Delaware's public policy in favor of enforcing contractually binding, written disclaimers of reliance on representations outside an integrated agreement:

> A party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a "but we did rely on those other representations" fraudulent inducement claim. . . . If there is a public policy interest in truthfulness, then that interest applies with more force, not less, to contractual representations of fact.

> To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing – the lie that it was relying only on contractual representations and that no other representations had been made – to enable it to prove that another party lied orally or in a writing outside the contract's four corners. For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract. Put colloquially, this is necessarily a "Double Liar" scenario. To allow the buyer to prevail on its claim is to sanction its own fraudulent conduct.

*ABRY Partners V, L.P.*, 891 A.2d at 1057.

In New Jersey, application of the fraud exception to the parol evidence rule also has its limits. *Filmlife, Inc. v. Mal "z" Ena*, 251 N.J. Super. 570, 574 (App. Div. 1991); *accord Miranda v. MarineMax, Inc.*, 2013 N.J. Super. LEXIS 2419, at *14 (App. Div. Oct. 7, 2013)). In particular, the exception is inapplicable where the "extrinsic evidence [] contradicts the express terms in an integrated document." *Miranda*, 2013 N.J. Super. LEXIS 2419, at *14 (citing *Filmlife, Inc.*, 251 N.J. Super. at 574) ("There is a distinction between fraud regarding matters expressly addressed in the integrated writing and fraud regarding matters wholly extraneous to the writing."). This limitation of the fraud exception is based on the rationale that parties "are usually bound by the import of documents signed by them and which they had the ability and opportunity to read." *Filmlife, Inc.,* 251 N.J. Super. at 575.

Finally, in Pennsylvania, while "the exact scope of the parol evidence rule … has not been as clearly delineated," case law indicates application of the fraud exception by Pennsylvania courts is also subject to limitations. *Palermo Gelato, LLC v. Pino Gelato, Inc.*, 2013 U.S. Dist. LEXIS 85925, at *13 (W.D. Pa. June 19, 2013). In particular, some lower courts have held that the parol evidence rule applies to fully integrated contracts "without regard to whether the contract also speaks to the subject matter of the alleged misrepresentation." *Id*.

Other lower courts, however, hold the parol evidence rule applies to preclude extrinsic evidence only if the misrepresentation does not involve "the same subject matter as the [integrated] contract." *Id.* (alteration added).

Based on the above, the Court finds the fraud exception to the parol evidence rule is not black and white but nuanced and fact-bound. The circumstances presented here require that the Court find the fraud exception inapplicable in this instance. First, the breadth and scope of paragraph 6 – defined by Finley and Mole, who were both represented by experienced counsel – is clear, precise and unambiguous. Not only did the parties disavow representations and promises not contained within the four corners of the document, Finley testified that any agreements he had with Talley were a "different deal," and "one agreement didn't have to do with the other one." Second, both Finley and Mole have comparable bargaining power and sophistication, with both possessing substantial knowledge and experience regarding business ventures, having worked together for an extended period in a commercial setting. Thus, it is nonsensical to assume Finley did not understand the import of paragraph 6 and the other parts of the Finley-Mole Agreement. Finally, in affixing his signature, Finley disclaimed reliance on any "promise, inducement, representation, or other statement made in connection with" the Finley-Mole Agreement. As was the case with the insurer in *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 212-13 (3d Cir. 2005), it is "unfathomable" that Finley, "[who] intended to rely on extracontractual representations, would agree" to such disclaimers.[10]

Given Finley's sophistication and the specific and unambiguous disclaimer, he may not rely on extrinsic evidence to show that the Finley-Mole Agreement was executed in reliance upon contrary representations not set forth in the document. Enforcing the Finley-Mole

---

[10] While *MBIA* was decided under Delaware law, its rationale fits this matter as well. In *MBIA*, the court found "an agreement [between sophisticated parties] may foreclose a fraud defense . . . by setting forth terms clearly inconsistent with reasonable reliance on extracontractual representations." 426 F.3d at 212-13 (alteration added).

Agreement advances the dual public policies of encouraging settlement and preserving the sanctity of contracts. *See FTC,* 133 S. Ct. at 2234 (settlement agreements); *McPeek v. Travelers Cas. & Sur. Co. of Am.*, 2006 U.S. Dist. LEXIS 28619, at *16 (W.D. Pa. May 10, 2006) (enforcement of contracts).

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

(1) Defendant's motion [DE 21] is GRANTED and the parties' settlement agreement shall be enforced;

(2) This case is dismissed; and

(3) The Clerk of Court shall CLOSE this case.

**Dated:** April 1, 2015                                    S\_____
                                                                                **RUTH MILLER**
                                                                                United States Magistrate Judge